SEA ISLAND BROADCASTING CORPO-
RATION OF S. C., Appellant

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee.

No. 76–1735.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 2, 1978.

Decided Jan. 14, 1980.

Rehearing Denied March 5, 1980.
Certiorari Denied Oct. 6, 1980.
See 101 S.Ct. 105.

John H. Midlen, Jr., Washington, D. C.,
with whom John H. Midlen, Washington, D.
C., was on the brief, for appellant.

Thomas R. King, Jr., Counsel, F. C. C.,
Washington, D. C., with whom Robert R.
Bruce, Gen. Counsel and Daniel M. Arm-
strong, Associate Gen. Counsel, Wash-
ington, D. C., were on the brief, for appel-
lee.

Before, LEVENTHAL * and ROBIN-
SON, Circuit Judges, and RICHEY **,
United States District Judge for the Dis-
trict of Columbia.

Opinion for the Court filed by Circuit
Judge LEVENTHAL.

LEVENTHAL, Circuit Judge:

This case is before the court on appeal by
Sea Island Broadcasting Corporation (Sea
Island) from a decision of the Federal Com-
munications Commission which revoked its
license to operate WSIB, an AM radio sta-
tion in Beaufort, South Carolina.[1]  The

---

* This opinion was written by *Circuit Judge* Lev-
enthal and concurrences were received from
the other Judges prior to his death.

** Sitting by designation pursuant to 28 U.S.C.
§ 292(a).

1. The Commission's Decision is reported at 60
FCC 2d 146 (1976) (J.A. 19). The Memoran-
dum Opinion and Order denying reconsidera-
tion is reported at 64 FCC 2d 721 (1977) (J.A.
36).

Commission's revocation was based primarily on grounds that the owner and officers of Sea Island made deliberate misrepresentations and other misleading and deceptive statements to the Commission in order to conceal improper billing practices. The Commission concluded that Sea Island has shown "a classic pattern" of such misrepresentations and misleading statements "when it believed it could effectively conceal suspected wrongdoing."[2] It further ruled that the kinds of fraudulent billing used by Sea Island "were serious and reinforced our conclusion to revoke Sea Island's license." The Commission concluded:

> In short, the effective regulation of the communications industries under our jurisdiction is premised on our ability to depend on the accuracy and truthfulness of our licensee's representation to us. Once we find that we cannot rely on a licensee's representations to us, the only suitable penalty is revocation of the license.

In denying reconsideration, the Commission pointed out that it had given Sea Island a fair opportunity to present its arguments and that it had had oral argument before the Commission upon the exceptions to the initial decision of the presiding administrative law judge. The Commission stated:

> Hearing oral argument in a proceeding such as this provides the Commissioners with the opportunity to ask the parties probing questions on any matters of record, including the evidence and the findings and conclusions of the presiding judge as well as the significant arguments raised in the written pleadings of the various parties.

The case arises out of an investigation by the FCC's Broadcasting Bureau in 1973 into the station's advertising sales and billing practices. The Commission's rules provide that no licensee shall knowingly issue any documents which misrepresent the amounts charged for advertising, the nature, content or quality of the advertising, or the date or time of broadcast.[3]

The record discloses that Sea Island admitted the facts forming the basis for the Commission's finding that it violated the rule. It suffices here to mention the violation that occurred when Charles Bell, Jr., sales and station manager, and a vice president, treasurer and director, entered into an agreement with one Smith, manager of a TV store (Palmetto). Smith agreed to purchase cooperative advertising on WSIB, and in return Bell agreed to rebate to Palmetto its share of the cost of the cooperative advertising. The mother of Charles Bell, who was secretary of the corporation, and business manager, issued rebate checks of approximately $2500, which caused a national cooperative advertiser, Philco-Ford, to pay twice what it should have paid for the advertising run on WSIB. Eventually Charles Bell, Sr. wrote to the Bureau on November 16, 1973, admitting to the rebates by WSIB of one-half of the amount of monthly billings to Palmetto. However, when the field investigators interviewed both Charles Bell, Sr. and Charles Bell, Jr. in April 1973, they denied knowledge of fraudulent billing. At the hearing Charles Bell, Jr. admitted that his statement was false. His position was that he did not believe the rebates violated the rule though he thought the arrangement was shady. As to Charles Bell, Sr. he had previously written a letter to the Commission on October 3, 1977, in response to letters from the Complaints Division of the Broadcast Bureau on August 29, requesting information, and on September 18, indicating that comparison of ledger sheets gave indication that WSIB may have been involved in fraudulent billing.

In the October 3 letter Charles Bell, Sr. stated that the billing procedures had been "carefully reviewed," stated that he had

**2.** 60 FCC 2d at 30.

**3.** 47 C.F.R. § 73.1205 (1976) (Addendum) is known as the "fraudulent billing rule." This rule was amended in 1976, but the amendment was minor and not pertinent to this case. 41 Fed.Reg. 23675–78 (1976). The term "fraudulent billing" has become an abbreviated manner of referring to various billing practices prohibited by Section 73.1205. Decision, 60 FCC 2d at 147 n. 2 (J.A. 20 n. 2).

been unable to find an explanation from the employee who made the bookkeeping entries ("not a trained bookkeeper") of the matter and advised that it was not the handwritten ledger sheets but the typewritten ledger sheets that were used for billing. Bell's subsequent testimony revealed that before sending the October 3 letter he had not questioned his wife (the bookkeeper), his son, or Palmetto's proprietor about the matter and had not inspected the typewritten ledger sheets which had been used. He later wrote the Bureau that it was not until after his October 3 letter and his examining the typewritten ledger sheets as instructed, that he discussed the matter with his wife and son and learned that his son had agreed to the rebate.

The Administrative Law Judge reached the following conclusion as to the credibility of Bell, Sr.:

It has been found that time after time Bell, Sr. denied knowledge of the fraudulent billing under circumstances which render those denials impossible of belief. He apparently believed that if he could paint himself as the credulous victim of a wife and son who permitted him to destroy himself through their silence he could escape accountability. The record warrants no such conclusion.

The Commission agreed with the ALJ's findings and conclusions:

We cannot believe that Bell, Sr. did not question his wife or son about possible fraudulent billing for over five months following the April 1973 visit to WSIB by Commission investigators.

\* \* \* \* \* \*

Upon receipt of the Commission's September 18, 1973 letter he must have known that WSIB billing practices concerning the Palmetto account, were being questioned by the Commission. Further, Bell knew that his wife kept the station's records and thus would have to know about any fraudulent billing practices and that his son was the salesman for the Palmetto account. Bell's explanation

that he did not question his wife and son because he trusted them does not make sense. If he trusted them he would have no natural reason for not questioning them.

The Commission stated: "The crux of our decision to revoke Sea Island's license is our conclusion that the owner and officers of Sea Island made deliberate misrepresentations to the Commission. . . . " It is abundantly clear from the foregoing that there was substantial evidence to support the Commission's order of revocation.

Appellant further argued that the Commission assumed that its only task was to determine whether there was "substantial evidence" to support a finding of misrepresentation and fraudulent billing. Had it governed itself by such a standard, it would clearly have been in error,[4] would have confused the standard for judicial review ("substantial evidence") with the standard of proof governing the agency. While the Commission report does use the term "substantial" it is in a context which showed that it was requiring that the evidence be "reliable, probative and substantial." We reject appellant's contention.

Appellant separately argued that the standard of proof necessary to the Commission in order to justify such an order must be "clear and convincing." The appellant considered the case governed by *Collins Securities Corp. v. SEC*, 183 U.S.App.D.C. 301, 562 F.2d 820 (1977). And it argued that the Commission had applied a "preponderance of evidence" standard, and did not require "clear and convincing evidence."

After oral argument, the court remanded the record to the Commission in order that it might have the views of the Commission concerning the following matters:

(1) What standard of proof was applied in the disposition of this matter by the Commission?

(2) What would be the effect on the public interest if the Commission were to apply a "clear and convincing" standard of proof to issues of fact in license revocation proceedings?

4. *Charlton v. FTC*, 177 U.S.App.D.C. 418, 543 F.2d 903 (1976).

In its report to the court, adopted November 30, 1978 [5] the Commission stated:

that when it reviewed the Initial Decision and the record in this proceeding, *de novo*, it applied the customary standard of proof in an administrative proceeding, *i. e.*, the preponderance of the evidence test. 69 FCC 2d at 1797.

The use of the "preponderance of evidence" standard is the traditional standard in civil and administrative proceedings. It is the one contemplated by the APA, 5 U.S.C. § 556(d).[6]

In its report the Commission stated that the evidence supporting its action of revocation was sufficient to meet the "clear and convincing test," but further submitted that the *Collins* test is not applicable to this case and actions by the FCC.

In support of its view that *Collins* is not applicable, the Commission submitted: Broadcasters have a special "public trust" status, as public trustees of a scarce resource. In view of the scarcity of broadcast frequencies "the grant of a license to one person precludes another from obtaining such a privilege." Since the licensees "receive very significant benefits by virtue of their status as Commission licensees, they owe the public a very high standard of stewardship in return for their privileged positions." It is not appropriate to require a higher standard of proof than traditional preponderance, where the licensee has abused its "special fiduciary duty to the public." The loss of a broadcast license does not amount to potential deprivation of a livelihood as in *Collins* since the former licensee may still obtain a job in the broadcasting industry and the revocation of one license "would not necessarily result in the loss of any other broadcasting station's license held by such a licensee." The analysis in FCC revocation proceedings does not usually rely on the sophisticated type of inferential proof that is involved in SEC proceedings. "Our revocation proceedings usually involve relatively simple factual questions such as whether a particular licensee violated our rules by performing or failing to perform certain acts."

While the Commission has some persuasive points, it has not satisfied us that the difference in consequence is notable in terms of distinguishing an SEC revocation from an FCC revocation. The broadcaster who loses his license may get other jobs in the industry, but he certainly has lost a business. The holder of multiple licensees may continue to hold one although another is revoked, but the fact of revocation of one license would not be ignored in case of a challenge to other licenses.

That the revocation grounds may be simply proved is no reason for requiring less evidence of the violation. True, there is less danger of misapprehension of issues, but correspondingly there should be little burden involved in making clear proof of the fraud.

The Commission is concerned lest a higher standard of proof either weaken its regulation authority or encourage or sanction shady tactics by licensees. There is a difference between the duty imposed on a licensee (the higher standard pertinent to a trustee) and the degree of proof required to convince the decision maker that there has been a violation of that duty. The fiduciary duty is good reason for holding that when there has been a misrepresentation even on a relatively minor matter, the very fact of misrepresentation is more important than the item involved, since the Commission must proceed on the basis of absolute trust and confidence in the representations made to it by its licensees. *FCC v. WOKO, Inc.*, 329 U.S. 223, 67 S.Ct. 213, 91 L.Ed. 204 (1946); *Lorain Journal Co. v. FCC*, 122 U.S. App.D.C. 127, 351 F.2d 824.

What is perhaps a more important distinction between FCC and other licenses is this: A broker has expectation of business for a lifetime. An FCC broadcast license is

---

5. *In re Sea Island Broadcasting Corp. of S. C. (WSIB)*, 69 FCC 2d 1796 (1978).

6. H.R.Rep. No. 1980, 79th Cong., 2d Sess. 37 (1946) reprinted in S.Doc. No. 248, 79th Cong., 2d Sess., Administrative Procedure Act—Legislative History 271 (1946).

for a three-year period. It may even be removed from a person who is law-abiding if another is distinctly superior, as shown in a subsequent comparative proceeding. In such a proceeding it would suffice that distinctly superior capability, under the various criteria used by the FCC in comparative proceedings, be shown by a preponderance of evidence.

■ However, there is a "security" of interest during a license term even assuming there is none at the end of a term. *CAB v. Delta Air Lines*, 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1961). And in the case of FCC licenses there is some expectancy of renewal, for a wide range of situations, at least in terms of a preference over others who are only equally qualified. *Fidelity Television v. FCC*, 169 U.S.App.D.C. 225, 243, 515 F.2d 684, 702 (1975).

There is also the consideration that when the FCC proceeds against a licensee for civil liability, because of violation of FCC rules, the appropriate standard would be preponderance of the evidence. True that would be the standard applied by the court in a *de novo* proceeding, but the liability would be assessed initially by FCC under a preponderance standard; see 5 U.S.C. § 554, as governing agency forfeiture proceedings.

After all the analysis, we stand with the view that revocation of an FCC license is governed, at the agency level, by the "clear and convincing" standard of proof set forth in the *Collins* decision for an SEC revocation of a broker's license. We do not believe that this standard will, as the Commission fears, "significantly burden" its efforts to regulate licensees in furtherance of the public interest.

We do not suggest that the FCC should be required to apply a "clear and convincing" standard as to all matters which come before it. We certainly agree that there are many license revocation proceedings where nothing resembling a loss of livelihood is involved, as in the case of Amateur Band ("HAM") and Citizen Band ("CB")

licensees. The same consideration would likely apply to licenses in such services as the Industrial Radio Service (business, manufacturing, forest products, petroleum, power—see 47 C.F.R. Part 91) and Land Transportation Radio Service (railroads, buses, trucks, taxicabs, automobile emergency—see 47 C.F.R. Part 93), where radio frequencies are used merely as a means of increasing the efficiency of certain occupations or activities.

■ In this case the Commission has reported to the court that it would have made the same finding in using the "clear and convincing" standard. We have confidence in the accuracy of this representation. We set forth some pertinent facts in the preceding portion of this opinion. There is much more to the same effect. The Commission heard oral argument, and gave appellant an effective opportunity to do what it could to undercut the case mounted against it. Where the Commission expressly applies the "clear and convincing" standard, the judicial function is only to see whether there is "substantial evidence" to support the Commission's determination.[7] Because the Commission did not expressly set forth that standard in the first instance, and indeed resisted it on remand, we have been particularly careful. We are ourselves convinced that the Commission at all times considered the proof of appellant's derelictions to be clear and convincing.

*Affirmed.*

---

7. In an even more extreme case, where the jury is instructed to find a person guilty of a crime only if satisfied of guilt "beyond a reasonable doubt," its verdict is supported by the court so long as it is supported by substantial evidence.