# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 15, 2023　　　　　Decided July 14, 2023
　　　　　　　　　　　　　　Reissued September 19, 2023

No. 22-1018

ADVANCED ENERGY UNITED, INC., ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ALABAMA POWER COMPANY, ET AL.,
INTERVENORS

———

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

———

*Danielle C. Fidler* argued the cause for petitioners. With her on the briefs were *Maia Hutt*, *Alexandra Farrell, Todd G. Glass, Aaron Stemplewicz, Alexander L. Tom, John N. Moore, Caroline Reiser, Ben Norris,* and *Adrienne Mouton-Henderson. Jeffery S. Dennis* entered an appearance.

*Josiah Neeley* was on the brief for *amicus curiae* R Street Institute in support of petitioners.

*Ari Peskoe* was on the brief for *amicus curiae* Harvard Electricity Law Initiative in support of petitioners.

*Robert M. Kennedy*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Matthew A. Fitzgerald* argued the cause for intervenors Southeast EEM Members in support of respondent. With him on the brief were *Noel Symons* and *Katlyn A. Farrell*.

Before: WILKINS and RAO, *Circuit Judges*, and TATEL, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* RAO.

WILKINS, *Circuit Judge*: This petition challenges several interrelated orders of the Federal Energy Regulatory Commission ("FERC" or "Commission") that permitted the creation of a new energy transmission service across several states in the Southeast region of the United States, entitled the Southeast Energy Exchange Market ("SEEM").

FERC adopted the first order ("Deadlock Order") by operation of law when its four Commissioners deadlocked 2-2 on whether the overall proposal was "just and reasonable" and otherwise met the requirements of the Federal Power Act ("FPA" or "Act"), 16 U.S.C. § 824d(a), and related FERC regulations. In a later order by majority vote, the Commission accepted tariff revisions by transmission service providers within SEEM to enable the new transmission service.

Petitioners challenged these orders throughout the initial proceedings, on rehearing at the Commission, and now in this petition.

Petitioners raise a number of objections, claiming that the Commission failed to adequately respond to their concerns, misapplied or ignored its own precedent, and otherwise gave unreasoned responses to their comments. For the following reasons, we grant the petition in part, deny the petition in part, and remand to the Commission for further proceedings.

**I.**

**A.**

The FPA authorizes FERC "to regulate 'the transmission of electric energy in interstate commerce' and 'the sale of electric energy at wholesale in interstate commerce.'" *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 266 (2016) (quoting 16 U.S.C. § 824(b)(1)). The FPA does not, however, authorize the Commission to "regulate either within-state wholesale sales or . . . retail sales of electricity (*i.e.*, sales directly to users)." *Id.* at 267. Instead, "[s]tate utility commissions continue to oversee those transactions." *Id.*

Under the FPA, public utilities regulated by FERC are authorized to unilaterally set "rates, terms, and conditions for service—commonly referred to as tariffs." Pet'rs Br. 7 (citing 16 U.S.C. § 824d(c), (d)). Alternatively, "sellers and buyers may agree on rates by contract." Resp't Br. 6 (citing 16 U.S.C. § 824d(c), (d)). "'[A]ll rates and charges made, demanded, or received by any public utility for or in connection with' interstate transmissions or wholesale sales—as well as 'all rules and regulations affecting or pertaining to such rates or charges'—must be 'just and reasonable.'" *Elec. Power Supply Ass'n*, 577 U.S. at 266 (quoting 16 U.S.C. § 824d(a)). Further,

regulated utilities may not: "(1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service" "with respect to any transmission or sale subject to the jurisdiction of the Commission." 16 U.S.C. § 824d(b).

The FPA "contains two basic methods for changing electricity rates." *City of Bethany v. FERC*, 727 F.2d 1131, 1143 (D.C. Cir. 1984). Regulated utilities may unilaterally change "any such rate, charge, classification, or service, or [] any rule, regulation, or contract relating thereto" but only "after sixty days' notice to the Commission and to the public" unless the Commission excuses the notice requirement "for good cause shown." 16 U.S.C. § 824d(d). The "rate takes effect immediately after [the] sixty days' notice requirement has been satisfied." *City of Bethany*, 727 F.2d at 1143. Alternatively, should FERC "first determine[] that a rate set by a public utility is unjust, unreasonable, or unduly discriminatory," the Commission "itself may establish the just and reasonable rate." *Id.* (citing 16 U.S.C. § 824e(a)). In general, the FPA provides that any "actions of the Commission shall be determined by a majority vote of the members present" once a quorum of at least three members is present. *Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1169 (D.C. Cir. 2016) (quoting 42 U.S.C. § 7171(e)).

The FPA also outlines the process by which "[a]ny person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission" "may obtain a review of such order." 16 U.S.C. § 825*l*(a), (b). An aggrieved party "may apply for a rehearing within thirty days after the issuance of" the Commission's order. *Id.* § 825*l*(a). That

application must "set forth specifically the ground or grounds upon which such application is based." *Id.* The Commission is authorized to grant a rehearing, deny it, or "abrogate or modify its order without further hearing." *Id.* If the Commission fails to act on "the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied." *Id.*

Aggrieved parties must undertake this process with FERC before filing a petition for review of the Commission's order "in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia." *Id.* § 825*l*(b). Further, they must file a petition in the court of appeals "within sixty days after the order of the Commission upon the application for rehearing." *Id.* "Section 313(a) [of the FPA] states: 'No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon.'" *New England Power Generators Ass'n, Inc. v. FERC*, 879 F.3d 1192, 1198 (D.C. Cir. 2018) (quoting 16 U.S.C. § 825*l*(a)).

Unlike a FERC order arising from a majority vote by a quorum of the Commissioners, this case concerns an order resulting from a deadlock vote by the Commissioners. In 2016, this Court held that "FERC's deadlock does not constitute agency action, and the Notices describing the effects of the deadlock are not reviewable orders under the FPA." *Pub. Citizen*, 839 F.3d at 1172. Congress amended the FPA in 2018 to address the "[i]naction of [c]ommissioners." *See* America's Water Infrastructure Act of 2018, Pub. L. No. 115-270, 132 Stat. 3765, 3868 (codified at 16 U.S.C. § 824d(g)). The Act now provides that agency inaction on a rate change due to a 2-2 deadlock vote, among other things, is an institutional order of

FERC reviewable under 16 U.S.C. § 825*l*(b) and "each Commissioner" must add to the record a "statement explaining the views of the Commissioner with respect to the [rate] change." *Id.* § 824d(g)(1)(A–B).

**B.**

The Commission's oversight of the sale and transmission of electric energy has shifted over the years given significant changes in the market for energy transmission. Historically, "state or local utilities controlled their own power plants, transmission lines, and delivery systems, operating as vertically integrated monopolies in confined geographic areas." *Elec. Power Supply Ass'n*, 577 U.S. at 267. The provision of electric energy is a capital intensive industry, however, so utilities began "to share reserves with adjacent utilities." FERC, ENERGY PRIMER: A HANDBOOK OF ENERGY MARKET BASICS 36 (2020), https://perma.cc/6CWN-2UE5 [hereinafter ENERGY PRIMER]. They "built interconnecting transmission lines large enough to deliver power in case of a major generator outage or some other system disruption." *Id.* These reserve-sharing agreements led to the creation of power pools, "multilateral arrangements with members ceding operational control over their generating units and transmission facilities to a common operator." *Id.* at 37, 38.

Under this monopoly model, "utilities owned and operated the transmission lines with no obligation to allow others to use them," which was a "significant barrier to the development" of independent power plants and an independent power industry. *Id.* at 39. The Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776, authorized FERC "to grant transmission access on request," resulting "in a patchwork of transmission access," ENERGY PRIMER 39. Independent power plants are now more common and "almost all electricity flows not through 'the local

power networks of the past,' but instead through an interconnected 'grid' of near-nationwide scope." *Elec. Power Supply Ass'n*, 577 U.S. at 267.

FERC's approach to ensure "just and reasonable rates" changed to meet the times. Instead of "cost-based rate-setting traditionally used to prevent monopolistic pricing," the Commission works "to ensure 'just and reasonable' wholesale rates by enhancing competition—attempting, as [the Supreme Court] [has] explained, 'to break down regulatory and economic barriers that hinder a free market in wholesale electricity.'" *Id.* (quoting *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 554 U.S. 527, 536 (2008)).

One example of the Commission's efforts to enhance competition is a rule issued by FERC in 1996 to remedy, among other things, "undue discrimination in access to the monopoly owned transmission wires that control whether and to whom electricity can be transported in interstate commerce." *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, 61 Fed. Reg. 21540, 21541 (May 10, 1996) [hereinafter "Order No. 888"]. In Order No. 888, the Commission "found that electric utilities were discriminating in the 'bulk power markets,' in violation of § 205 of the FPA, by providing either inferior access to their transmission networks or no access at all to third-party wholesalers of power." *New York v. FERC*, 535 U.S. 1, 11 (2002). FERC "required the functional unbundling of wholesale generation and transmission services, and directed utilities to provide open, non-discriminatory access to their transmission facilities to competing electricity suppliers." Resp't Br. 8–9 (citing *New York*, 535 U.S. at 11–13).

Four years later, FERC built upon this reform with an order "encourag[ing] transmission providers to establish 'Regional Transmission Organizations'—entities to which transmission providers would transfer operational control of their facilities for the purpose of efficient coordination." *Morgan Stanley*, 554 U.S. at 536. Further, the Commission "has encouraged the management of those entities by 'Independent System Operators,' not-for-profit entities that operate transmission facilities in a nondiscriminatory manner." *Id.* at 536–37.

Today, "[t]wo-thirds of the population of the United States is served by electricity markets run by [seven] regional transmission organizations or independent system operators (RTO/ISOs or organized markets)." ENERGY PRIMER 61. The primary distinction between the "RTO/ISO markets and their predecessors (such as vertically integrated utilities, municipal utilities and co-ops) is that RTO/ISO markets deliver electricity through competitive market mechanisms." *Id.* "The centralized markets they operate employ auctions to set a uniform market-clearing price for energy the day before it is needed and establish binding schedules for the production and consumption of that energy." Resp't Br. 9.

Traditional wholesale markets still exist, "primarily in the Southeast and the West outside of California where utilities are responsible for system operations and management, and, typically, for providing power to retail consumers." ENERGY PRIMER 61. "Electric service providers in the Southeast bilateral market include vertically integrated utilities—*i.e.*, utilities that own the generation, transmission, and distribution systems used to serve consumers—federal government-owned providers, state-owned providers, and municipalities." Resp't Br. 7–8. Utilities in bilateral markets primarily generate their own energy to serve their customers or—and sometimes in

addition—enter "long-term power purchase arrangements" with other utilities. *Id.* at 8. "The amount of energy required by end users is called 'load,' and thus local utilities are sometimes referred to as 'load-serving entities.'" *Id.* at 6.

According to the Commission, utilities in these markets sometimes use short-term transactions to purchase energy from another utility when it is more expensive to generate the energy themselves. *Id.* at 8; *see also* ENERGY PRIMER 71. "Overall demand for short-term transactions tends to rise during periods of system stress, for example summer heat waves or winter cold snaps." ENERGY PRIMER 71. Historically, short-term transactions are less common than long-term energy transactions, with "[t]he Southeast ha[ving] relatively low volumes of short-term trades compared to the Western regions." *Id.*

It was against this backdrop that the Southeast Energy Exchange Market was created.

## C.

### 1.

On February 12, 2021, Southern Company Services, Inc., acting as agent for Intervenor Alabama Power Company, submitted the SEEM Proposal for FERC acceptance under Section 205(c) of the FPA. *See* J.A. 286. At its founding, SEEM consisted of 19 different entities—designated as "Members"—across 10 different states in the Southeast. *See* Pet'rs Br. 12. The SEEM Proposal was "filed as Alabama Power [Company's] Rate Schedule No. 1011 in its Market-Based Rate Tariff eTariff database" but was submitted on behalf of the SEEM Members. J.A. 286 n.2. The founding SEEM Members included "private investor-owned utility companies, state agencies, municipal utilities, nonprofit

electric cooperatives, and a Federal agency (the Tennessee Valley Authority)." Intervenors Br. 2.

The SEEM Proposal takes the form of a contractual agreement with numerous terms that outline SEEM's structure, governance, operations, and participation requirements. *See* J.A. 1032–94. As relevant here, Members have access to "an automated platform that facilitates intra-hour trades of energy." Resp't Br. 10. Non-members—designated as "Participants"—may also take part in SEEM energy transactions but lack the Member's authority to manage the business of SEEM. *See generally* J.A. 1043–44 (describing authority of SEEM Members). To join SEEM, prospective Participants must: (1) "Enter into a transmission service agreement with each SEEM Member that requires the delivery of such an agreement" to take SEEM transmission service; (2) "Own or otherwise control generation [(a 'Source')] and/or be contractually obligated to serve customers within the SEEM footprint [(a 'Sink')]"; (3) "Sign a SEEM [Participant] Agreement, which requires the signature of the SEEM Agent at the direction of SEEM's Operating Committee"; and (4) "Enter into an Enabling Agreement with at least three SEEM Participants." Pet'rs Br. 13 (citing J.A. 1081–82).

The transactions created by the SEEM Proposal differ in several key ways from traditional energy transactions in the Southeast region.

First, the transactions utilize otherwise-unused transmission capacity, namely "the transmission capacity that is available only after all other transmission customers make their transmission reservations." J.A. 133.

Second, the energy transmitted is described as "non-firm energy," meaning "product for which delivery or receipt of the energy may be interrupted for any reason or no reason, without

liability on the part of either buyer or seller." *Id.* at 1080. This differs from typical transactions in this market because most use agreements that require firm, or uninterruptible, energy intended to "assur[e] market participants of a specified quality and quantity of service under normal operating conditions." *Market Assessments: Glossary*, FERC, https://perma.cc/3P7D-WFM9. Firm energy service "can be either 'network' (*i.e.*, priority service with access to the entire network) or 'point-to-point' (*i.e.*, service between two locales)." Resp't Br. 96.

Third, rather than direct negotiation between buyers and sellers, SEEM's automated platform uses an algorithm to match bids and offers for electricity on 15-minute intervals with price matched transactions on a "split-the-savings" pricing basis. *See* J.A. 289. "'[S]plit-the-savings' pricing means that the transaction price will reflect the midpoint between the seller's offer price and the buyer's bid price, with an adjustment for losses." *Id.* at 289. SEEM transactions use an electronic tag, or "e-Tag," that "assigns and tracks the transmission systems used to deliver energy," Resp't Br. 79, and allows for the "coordination required between multiple entities," J.A. 1079. This transaction system is an innovation, not just due to the electronic platform but also since "there are few sub-hourly, non-firm energy transactions taking place today in the Southeast." *Id.* at 134.

Prior to SEEM, "[t]o engage in bilateral power purchases and sales, electric service providers have had to use phone or electronic communication tools to discover each other, negotiate terms of sale, arrange for transmission service, and schedule delivery." *Id.* at 119. While buyers and sellers are not entering direct negotiations like they had to before SEEM, they can use the SEEM platform's "toggle" feature to limit possible transaction partners—as long as three potential counterparties remain—based on geographic or other

"[c]ounterparty [s]pecific [c]onstraints" like a potential counterparty's credit limit. *Id.* at 312; *see also id.* at 1082–83.

Finally, buyers and sellers pay for the energy transmitted in SEEM transactions but do not have to pay a separate charge for the transmission service itself. This feature is unique as well, since transmission facilities have revenue requirements that are met, in part, by charging a particular tariff rate per transmission. *See id.* at 465. Zero-cost transmission also "allows entities to transact across multiple utility transmission systems without incurring cumulative transmission charges," also called "pancaked" transmission charges. Pet'rs Br. 51 (citing J.A. 317); *id.* at 11. This zero-charge transmission service is known as "Non-Firm Energy Exchange Transmission Service," or "NFEETS," in the SEEM Proposal.

The original submission requested that the SEEM Proposal become effective on May 13, 2021, but the Commission found the submission to be deficient. FERC requested additional information ranging from how the energy transactions under SEEM would occur to how non-Member utilities and other parties would participate. The SEEM Members ("Intervenors") responded in a submission dated June 7, 2021. After FERC found that response deficient, Intervenors submitted their final filing on August 11, 2021, asking FERC to accept the SEEM proposal. Both of Intervenors' responses "were treated as filing amendments and reset the clock for Commission action." Resp't Br. 16.

FERC also received submissions from other parties during this time. One of the Members—Tennessee Valley Authority, a federal utility serving power to over 10 million people in the Southeast—filed a motion to intervene to provide comments, noting its substantial interest in the proceeding and explaining how its participation was necessary for three other Members to

engage in SEEM transactions. Petitioners, who were in separate coalitions at the time, also filed motions and comments to raise issues with the SEEM proposal.

In their final submission, Intervenors "request[ed] an effective date (as to the Southeast EEM Agreement and concurrence filings) of October 12, 2021, sixty days from the filing." J.A. 1031. In actuality, sixty calendar days from August 11, 2021, was Sunday, October 10, 2021. FERC failed to issue an order on the SEEM Proposal by October 10, 2021, and on October 13, 2021, FERC released a notice stating that the SEEM Proposal went into effect by operation of law on October 12, 2021, under Section 205 of the FPA. *See* J.A. 23. The notice provided that the Commission failed to act on the SEEM Proposal as of October 11, 2021, "because the Commissioners [were] divided two against two as to the lawfulness of the change." *Id.* In accordance with the recently amended FPA, the Commissioners added statements to the record explaining their views as to the SEEM Proposal. Commissioners Christie and Danly voted to accept the Proposal, *see id.* at 60–75, 76–116, while Commissioners Glick and Clements voted to reject the Proposal, *id.* at 25–34, 35–59.

Petitioners, acting in two separate coalitions at the time, sought rehearing on the Commission's failure to act on the SEEM Proposal in submissions dated November 12, 2021. *See id.* at 1100–1245. While both requests raised similar issues with the SEEM Proposal, the Clean Energy Coalition Petitioners also moved, in the alternative, for clarification on the SEEM Proposal.

On December 10, 2021, FERC denied the rehearing requests as untimely and declined to address the alternative motion for clarification. *See id.* at 194–201. FERC noted that it "ha[d] not previously explained in an order the proper

calculation of the deadline for rehearing requests following the failure of the Commission to act within the time period prescribed by section 205(d) of the FPA," but did so in the order. J.A. 197. The Commission interpreted Section 205(d) of the FPA to provide that "the statutory period for Commission action established in section 205(d) expires on the later of the day prior to the effective date [requested by the applying party] or the 60th day after the filing is made." *Id.* at 198.

Since Intervenors requested an effective date of October 12, 2021, the last day the Commission could have issued an order on the SEEM Proposal—under FERC's construction of Section 205(d)—was October 11, 2021, a day after 60 days had passed from when the SEEM Proposal was filed. FERC went on to provide that it could not issue an order to accept or deny the SEEM filing except "in response to a timely request for rehearing . . . or a new section 205 filing in a new proceeding." *Id.* at 198. It noted that its regulatory calculation rules "cannot and do not operate to extend the statutory deadline for Commission action pursuant to section 205(d)." *Id.* at 199 (citing 18 C.F.R. § 385.2007(a)(2)).

Under FERC's construction, October 11, 2021, was the date of its inaction and thus the date of FERC's "order" as to the SEEM Proposal "per section 205(g)(1)(A)" of the FPA. *Id.* at 200. Accordingly, Petitioners' deadline—30 days after the order in question—was November 10, 2021. *Id.* Since Petitioners filed their requests for rehearing of the Deadlock Order on November 12, 2021, two days later, FERC stated that it "must reject both rehearing requests as untimely." *Id.* at 201.

Petitioners requested rehearing of the December 2021 order denying their rehearing request of the Deadlock Order.

The Commission also denied that request. SEEM launched on November 9, 2022. Intervenors Br. 2.

**2.**

Part of the SEEM Proposal required Members who were transmission service providers to request revisions to their tariffs to allow for NFEETS, the SEEM transmission service. They filed these requests at the same time as the SEEM Proposal, on August 11, 2021, but FERC addressed them separately after the SEEM Proposal was adopted by operation of law. J.A. 117. Petitioners submitted protests to the requested revisions, but FERC approved each revision in an order by majority vote of the Commissioners filed on November 8, 2021. *See id.* at 117–55. Commissioner Clements dissented and argued, among other things, that the requested tariffs "fail to provide for open access to the Southeast EEM and provide for rates that have not been shown to be just and reasonable." *Id.* at 156.

On December 8, 2021, Petitioners sought rehearing of the November 2021 order. That request was denied by operation of law on January 10, 2022. FERC issued an order addressing Petitioners' arguments raised on rehearing and denied them as unpersuasive over the dissent of Commissioner Clements. *Id.* at 226–56. For purposes of this opinion, the original order approving the tariff revision and FERC's order on rehearing are collectively referred to as the "Tariff Order."

**3.**

On November 24, 2021, Intervenors filed proposed amendments to the SEEM Proposal. FERC unanimously approved the amendments, limiting its review just to the proposed revisions and not the entire SEEM Proposal. The amendments addressed concerns raised about the transparency

of SEEM and the original SEEM Proposal's application of *Mobile-Sierra* to the entire agreement. The *Mobile-Sierra* doctrine requires FERC to "presume a contract rate for wholesale energy is just and reasonable" and mandates that the Commission "cannot set aside the rate unless it is contrary to the public interest." *Okla. Gas & Elec. Co. v. FERC*, 827 F.3d 75, 76 (D.C. Cir. 2016).

FERC accepted the proposed amendments and, among other things, limited the "*Mobile-Sierra* application of the just and reasonable standard of review to future changes to certain specified provisions" of the SEEM Proposal. Resp't Br. 26; *see also id.* at 65–66 (outlining the provisions to which the *Mobile-Sierra* presumption applies); J.A. 1152 (listing provisions). Petitioners requested rehearing of this order, but the request was denied by operation of law. FERC issued an order on May 19, 2022, addressing Petitioners' arguments on rehearing but reached the same result.

## II.

We begin, as we must, with questions of our jurisdiction. *See Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 510 (D.C. Cir. 2018) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)).

## A.

The first jurisdictional issue we address is standing. "[S]tanding has three parts: injury in fact, causation, and redressability." *Util. Workers Union of Am. Loc. 464 v. FERC*, 896 F.3d 573, 577 (D.C. Cir. 2018). Petitioners assert that they "satisfy the test for associational standing." Pet'rs Br. 24. To successfully demonstrate associational standing, Petitioners must establish that "(1) at least one of [their] members would have standing to sue in his own right; (2) the interest [they]

seek[] to protect is germane to [their] purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit." *Ctr. for Biological Diversity v. EPA* ("*Center*"), 861 F.3d 174, 182 (D.C. Cir. 2017) (quotation marks omitted).

"Where, as here, a case comes to us on a petition directly from an agency, the petitioner's burden of production . . . is . . . the same as that of a plaintiff moving for summary judgment in the district court: it must support each element of its claim to standing by affidavit or other evidence, including whatever evidence the administrative record may already contain." *Util. Workers*, 896 F.3d at 577 (quotation marks omitted). "A petitioner seeking [the Court's] direct review of agency action cannot rest on bare assertions; it must 'identify in the record evidence sufficient to support its standing to seek review or, if there is none because standing was not an issue before the agency, submit additional evidence to the court of appeals.'" *Id.* at 578 (quoting *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002)). "Once one petitioner has demonstrated standing[,] [the Court] may permit the participation of others." *Env't Action v. FERC*, 996 F.2d 401, 406 (D.C. Cir. 1993).

Petitioners represent two categories of groups. The first, "bulk energy market participants," assert that their "business interests are harmed by FERC's orders." Pet'rs Br. 24. For example, Voltus, a member of Petitioner Advanced Energy United, Inc. ("AEU"), is a "leading software platform" that connects "distributed energy resources (DERs) to electricity markets." Pet'rs Br. Add. 117. Its Chief Regulatory Officer attests that FERC's approval of SEEM harms Voltus because it "does not meet the SEEM Agreement's entrance requirements" to become a Member or Participant, "which forecloses revenue streams and opportunities for [its] business." *Id.* at 119. The second group of petitioners includes

"residential and commercial customers" in the Southeast who claim that "FERC's approval of SEEM . . . [will] increase[e] in the long term the rates they pay for electricity." Pet'rs Br. 24–25.

The Voltus declaration "assert[s] injuries under the doctrine of competitor standing, which recognizes that economic actors suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition." *Am. Fuel & Petrochem. Mfrs. v. EPA*, 3 F.4th 373, 379 (D.C. Cir. 2021) (quotation marks omitted). Like SEEM, Voltus uses a software platform to facilitate energy transactions and attests to having at least one customer in the region. *See* Pet'rs Br. Add. 117–18. Since Voltus does not meet the SEEM participation requirements, however, its ability to compete and deliver services in the SEEM footprint is limited relative to SEEM Participants. *See id.* at 118–20. Accordingly, AEU has shown that FERC's orders result in an "imminent increase in competition" for at least one of its members, and "the rest of the standing inquiry . . . falls into place: the increased competition is caused by the agency's action and redressed by restoring the regulatory *status quo ante*." *Am. Fuel & Petrochem. Mfrs.*, 3 F.4th at 379. The first requirement to establish associational standing is therefore met.

The second and third requirements are also established here. AEU is a trade association "dedicated to making energy secure, clean, and affordable." Pet'rs Br. vi. The interests AEU seeks here—promoting "competition from lower-cost independent power producers" and the lower "cost of electricity that utilities pass through to Petitioners' members," *id.* at 25—are "germane to its purpose," *Center*, 861 F.3d at 182. There is also no argument that AEU's members are required to participate in this litigation to seek judicial review

of the underlying orders. Accordingly, AEU has established associational standing.

Since one of the Petitioners has demonstrated standing, the remaining may appear before the Court. *See Env't Action*, 996 F.2d at 406.

**B.**

The Commission challenges the Court's jurisdiction over the petition seeking review of the Deadlock Order. A petitioner's timely filing of request for rehearing of a FERC order "is a mandatory petition-for-rehearing requirement" that provides an "express statutory limitation on the jurisdiction of the court." *New England Power Generators Ass'n*, 879 F.3d at 1197 (quotation marks omitted). While it is undisputed that the Petitioners filed timely petitions for rehearing as to the Tariff Order, the Commission argues that the Petitioners failed to submit a timely petition for rehearing of the Deadlock Order which accepted the SEEM Proposal by operation of law.

To answer this question, we must interpret Section 205(g) of the FPA. Section 205(g) includes a provision addressing administrative proceedings related to inaction by FERC, *see* 16 U.S.C. § 824d(g)(1), and a provision conferring federal court jurisdiction to review "orders" arising from FERC's inaction, *see id.* § 824d(g)(2). While both the Commission and Petitioners rely upon prior FERC rulings and regulations to interpret whether the petition for rehearing was timely, "agencies get no deference in interpreting jurisdictional statutes." *Allegheny Def. Project v. FERC*, 964 F.3d 1, 18 (D.C. Cir. 2020) (en banc). Section 205(g), through reference to Section 205(d), 16 U.S.C. § 825*l*, "addresses both the filing of an application for rehearing as a precondition to judicial review, and the effect of agency inaction within a specified time limit on opening the courthouse doors." *Allegheny*, 964

F.3d at 12.  Accordingly, interpretation of the statute "falls to the courts, not to the Commission," *id.* at 12, and the meaning is decided *de novo*.  *Id.* at 11–12; *see also United Mine Workers of Am., Int'l Union v. Dole*, 870 F.2d 662, 665 (D.C. Cir. 1989) ("Statutory provisions laying down time periods for taking appeals, like any other enactments, must be interpreted and applied by courts; in so doing we use the federal rules as guides.").

To interpret the statute, "we begin by examining the text." *Carter v. United States*, 530 U.S. 255, 271 (2000).  Section 205(g) provides:

**(g) Inaction of Commissioners**

**(1) In general**

With respect to a change described in subsection (d), if the Commission permits the 60-day period established therein to expire without issuing an order accepting or denying the change because the Commissioners are divided two against two as to the lawfulness of the change, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum--

**(A)** the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of section 825*l*(a) of this title; and

**(B)** each Commissioner shall add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change.

**(2) Appeal**

If, pursuant to this subsection, a person seeks a rehearing under section 825*l*(a) of this title, and the Commission fails to act on the merits of the rehearing request by the date that is 30 days after the date of the rehearing request because the Commissioners are divided two against two, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum, such person may appeal under section 825*l*(b) of this title.

16 U.S.C. § 824d(g). Section 205(d), which is referenced in Section 205(g)(1), states:

**(d) Notice required for rate changes**

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the

schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

*Id.* § 824d(d). Under FERC's construction of section 205(d), the last day the Commission could have issued an order on the SEEM Proposal was October 11, 2021, the day before the proposed effective date. Accordingly, the final date for FERC to act on the SEEM Proposal was October 10, 2021. Since that date "marks the consummation of the agency's decisionmaking process," it serves as the date of the Commission's "order" for purposes of judicial review under Section 313 of the FPA. *Pub. Citizen*, 839 F.3d at 1171. Under the plain language of Section 313, Petitioners had to "apply for a rehearing within thirty days after the issuance of [the October 11, 2021] order." 16 U.S.C. § 825*l*(a). Thirty days from October 11, 2021, was Wednesday, November 10, 2021. Petitioners' filing on Friday, November 12, 2021, was, therefore, untimely under the text of the relevant statutes standing alone.

However, our analysis does not end with the statutory text. We use the time computation rules of Federal Rule of Appellate Procedure 26 to construe "any statute that does not specify a method of computing time." FED. R. APP. P. 26(a); *see also Dole*, 870 F.2d at 664–65. Those rules, like FERC's own time counting regulations, specify that any time period for which "the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a

Saturday, Sunday, or legal holiday." FED. R. APP. P. 26(a)(1)(C); *see also* 18 C.F.R. § 385.2007(a)(2) ("In each case the [time] period does not end until the close of the Commission business of the next day which is not a Saturday; Sunday; . . . or legal public holiday.").

Here, the Commission's deadline—October 11, 2021—was a federal holiday, Columbus Day. Accordingly, the final date that FERC could have exercised its authority was October 12, 2021. Since 30 days after that date—November 11, 2021—was also a federal holiday, Veterans Day, the last day Petitioners could have filed their petition for rehearing of the Deadlock Order was November 12, 2021. *See Dole*, 870 F.2d at 665 ("[T]ime periods, including jurisdictional time periods, are to be construed in accordance with Fed. R. App. P. 26(a), excluding final weekend days and holidays unless a specific statutory provision requires otherwise.").

Accordingly, the Commission erred in finding the petition for rehearing of the Deadlock Order untimely below, and the related orders finding as such are therefore vacated. While this Court has jurisdiction over the petition under Sections 205(g) and 313(b) of the FPA, *see* 16 U.S.C. §§ 824d(g), 825*l*(b), the Court will remand the petition as it relates to the acceptance of the SEEM Proposal and related amendments to "the Commission . . . so that it may . . . consider and rule upon [Petitioners'] application for rehearing" in the first instance. *Dayton Power & Light Co. v. Fed. Power Comm'n*, 251 F.2d 875, 877 (D.C. Cir. 1957).

**III.**

As noted above, FERC accepted "tariff revisions implementing the Non-Firm Energy Exchange Transmission Service" in a majority-vote order, Resp't Br. 77; *see also* J.A. 117–93, and reached the same result in a separate order after

Petitioners requested rehearing, *see* J.A. 226–56. This Court has jurisdiction over the Petition as it relates to the Tariff Order as it is undisputed that Petitioners' requests for rehearing of the Tariff Order were timely submitted.

This Court "review[s] FERC's ratemaking orders under the Administrative Procedure Act's arbitrary and capricious standard." *Emera Me. v. FERC*, 854 F.3d 9, 21 (D.C. Cir. 2017). The Court's "role . . . is to ensure that the Commission's judgment is supported by substantial evidence and that the methodology used in arriving at that judgment is either consistent with past practice or adequately justified." *Id.* at 22. Further, the Court's "review in ratemaking cases is . . . limited to ensuring that the Commission has made a principled and reasoned decision supported by the evidentiary record." *Id.* (quotation marks omitted). While the Court's standard of review is "highly deferential," "it bears repeating that courts have never given regulators carte blanche." *Id.* (quotation marks omitted). Though the Court has "recognized FERC's discretion in ratemaking cases, [the Court] ha[s] stated that in all cases, the Commission must explain its reasoning when it purports to approve rates as just and reasonable." *Id.* at 23 (quotation marks omitted).

Petitioners raise several challenges to the Tariff Order. We address each in turn.

**A.**

The Petitioners' first challenge is unavailing. We have noted that "transmission-owning utilities . . . can be expected to act in their own interest to maintain their monopoly . . . even if they do so at the expense of lower-cost generation companies and consumers." *Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667, 684 (D.C. Cir. 2000) (per curiam). Petitioners argue that the Commission "disregarded th[is] basic

principle of utility regulation" by assuming Intervenors, as monopoly utilities, would not use the SEEM participation requirements and other "new mechanisms" in their own interest at the expense of their customers. Pet'rs Br. 45–46. They reference an expert affidavit they submitted during the administrative proceedings explaining how different features of SEEM could allow Intervenors to discriminate against prospective Participants. *Id.* at 46; *see also* J.A. 804–10. Petitioners contend that the Commission improperly required Petitioners to prove that the Intervenors "ha[d] a subjective intent to take advantage of known opportunities to unduly discriminate," Pet'rs Br. 45–46, when Intervenors actually had the burden under Section 205 to demonstrate that the requested tariff revisions were "just and reasonable," 16 U.S.C. § 824d(e).

Petitioners' argument is not without some merit. Their expert affidavit explained numerous ways SEEM's participation requirements could be manipulated by a Member acting in its own monopoly interests. *See* J.A. 804–10. The affidavit provided, for example, that the "largest generation owning entities" could "'toggle off' potential counterparties in a coordinated strategy to block any beneficial trades." *Id.* at 805. Yet, at many points, the Tariff Order is dismissive of Petitioners' evidence and concerns. *See, e.g.*, *id.* at 146 ("No evidence in the record suggests the Operating Committee will prevent the Agent from countersigning a given Participant Agreement.").

Here, however, the Commission properly concluded that the record demonstrated that SEEM's structure disincentivizes such anticompetitive behavior. As the Commission found, SEEM's automated bidding platform encourages existing Participants to contract with "as many potential counterparties as possible in order to maximize the number of potential

bilateral transactions." *Id.* Under this record, it was not arbitrary and capricious for the Commission to find that SEEM's model discouraged Members from acting in bad faith. Further, and as the Commission highlights, the Tariff Order explains that it placed the burden of proof on the relevant Intervenors, as applicants for the tariff revisions. *See id.* at 238 ("We continue to find that Filing Parties have satisfied their burden under section 205 of the FPA . . . .").

Accordingly, Petitioners fail to demonstrate that the Commission "unjustifiably assum[ed]" that the requested tariff revisions were just and reasonable, Pet'rs Br. 45, or "altered the burden of proof" in its determination that the SEEM participation requirements were not unduly discriminatory, Pet'rs Reply Br. 23.

**B.**

However, we find merit in Petitioners' contention that FERC's approval of the Tariff Order is inconsistent with prior Commission regulations "requir[ing] jurisdictional transmission tariffs to be consistent with or superior to the *pro forma* open-access transmission tariff contained in its Order No. 888 rulemaking, which directed utilities to provide open access to their transmission lines in a nondiscriminatory fashion." Resp't Br. 85; *see also* Pet'rs Br. 58–60.

They argue that SEEM's condition that Participants have a Source or Sink in the SEEM geographic footprint contravenes Order No. 888's requirement that "[a] non-discriminatory open-access tariff must be available to any entity that can request transmission services." 61 Fed. Reg. at 21570. FERC's "*pro forma* tariff contains minimum terms and conditions of non-discriminatory service." *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 531 (D.C. Cir. 2010) (per curiam) (quotation marks omitted). While "[t]ransmission

providers may adopt tariff provisions that deviate from those of the *pro forma* tariff," the "deviations must be consistent with or superior to the terms of the *pro forma* tariff." *Id.* (quotation marks omitted).

As noted in the prior section, the Commission determined that the requested tariff revisions were "just and reasonable and not unduly discriminatory or preferential." J.A. 133. For this reason, the Commission found the requested tariff revisions to be "consistent with or superior to the *pro forma* [Open Access Transmission Tariff]" even though that determination arises from a different inquiry than that of Order No. 888's open access requirement. J.A. 238–39. The Commission's primary finding was that the SEEM participation requirements, specifically the geographic requirement that SEEM Participants must be a Source or Sink in the geographic area (ostensibly to allow for the e-Tag system and 15-minute interval trades) and the three-eligible-counterparty rule, were not unduly discriminatory because they "incorporate preexisting requirements in the Southeast bilateral market, are widely-used, and are also necessary from an operational perspective." *Id.* at 239. In effect, the Commission determined that the requested tariff revisions' deviations from Order No. 888's *pro forma* tariff were proper given the expected value of the SEEM service, the equal terms applied to all prospective entities in the region, and the technical requirements necessary to allow the service to operate.

This explanation would be reasonable if we were operating from a clean slate. Order No. 888's *pro forma* tariff requirement means "any entity that can request transmission services" should be able to access those services. 61 Fed. Reg. at 21570. Since entities located outside of the geographic region cannot use the required e-Tags to request SEEM's intra-

hour transactions, it follows that Order No. 888 would not prohibit a tariff that excludes such entities.

Here, however, the record reflects 65 *existing* bilateral trading partners who cannot participate in this new service due to the geographic requirement. Pet'rs Br. 59 (citing J.A. 1269). Prior to SEEM, trading partners in the Southeast bilateral market were required to register "generation resources and customer delivery points," but they were not obligated to be located within a specific geographic footprint to conduct transactions as SEEM mandates. *Id.*; *see also* Resp't Br. 79. The Commission maintains that the geographic limitation is "necessary from an operational perspective," J.A. 239, since— as Intervenors submitted—"the necessary communications with neighboring transmission systems could not take place 'in the less-than-20 minute timeframe' required to effectuate Market transactions," Resp't Br. 79 (quoting J.A. 145). Yet, the Commission fails to grapple with the objection that any exclusionary "technical requirement" is one of the Intervenors' own making. J.A. 145.

Intervenors developed SEEM, and there is no explanation in the record why they could not have "invested in the software or other analytical capabilities necessary to facilitate access" to SEEM for existing bilateral trading partners outside of the stated geographic footprint. J.A. 162. The creation of a new service that—by its design—excludes existing market participants evokes the discriminatory practices against third-party competitors by monopoly utilities that prompted the Commission's adoption of Order No. 888. *See New York*, 535 U.S. at 11 (noting that the Commission issued Order No. 888 after finding "that electric utilities were discriminating in the 'bulk power markets' . . . by providing . . . no access at all to third-party wholesalers of power"). The Commission fails to offer an adequate explanation for how the requested tariff

revisions are "consistent with or superior to" the *status quo* when the only explanation for SEEM's exclusion of existing bilateral trading partners is that it was simply designed that way.

On remand, the Commission should provide a more fulsome explanation for why the "market design decisions made by the filing parties"—couched as operational requirements and limits associated with "technical feasibility"—are actually superior to the *status quo* in light of Order No. 888's open access principles. J.A. 253–54; *see also id.* at 144. Rather than 15-minute intervals, could SEEM provide intra-hour trades at a longer interval that would still be cost-effective while allowing for existing trading partners outside of the region to request service? Is there any other workable alternative besides e-Tags that would not exclude existing partners yet allow for intra-hour trades? Order No. 888 requires a more cogent explanation when the design of a new service denies access to preexisting market participants.

Accordingly, the Commission failed to explain how the requested tariff revisions were "consistent with or superior to the terms of the *pro forma* tariff" in light of Petitioners' objections. *Sacramento Mun. Util. Dist.*, 616 F.3d at 531 (quotation marks omitted).

## C.

Petitioners' next argument is also persuasive. They contend the Commission erred in finding that SEEM is not a "loose power pool" as defined by Commission regulations. *See generally Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, 62 Fed. Reg. 12274 (Mar. 14, 1997) [hereinafter "Order No. 888-A"]. Utilities that are members of

"loose power pools" are required to allow open membership and ensure that pool transmission service be made available to non-members through a joint, pool-wide open access transmission tariff "regardless of the type of entity, affiliation, or geographic location." Order No. 888, 61 Fed. Reg. at 21594; *see also* Order No. 888-A, 62 Fed. Reg. at 12313.

Order No. 888 defines a "loose pool" as "any multi-lateral (more than 2 public utilities) arrangement, many of which contain discounted and/or special transmission arrangements." 61 Fed. Reg. at 21594. The Commission later clarified the definition of a "loose pool" in Order No. 888-A, explaining that a loose pool is "any multilateral arrangement, other than a tight power pool or a holding company arrangement, that explicitly or implicitly contains discounted and/or special transmission arrangements, that is, rates, terms, or conditions." 62 Fed. Reg. at 12313. As Petitioners note, the Commission concedes that SEEM constitutes a "multi-lateral arrangement." *See* J.A. 147–48. Accordingly, the outstanding issue is whether SEEM "explicitly or implicitly contains discounted and/or special transmission arrangements." Order No. 888-A, 62 Fed. Reg. at 12313.

The Commission construes Order No. 888-A's language of "*discounted . . .* rates, terms, or conditions," *id.* (emphasis added), to not include a rate that "'entails no opportunity cost' and is not a substitute for any transmission service," Resp't Br. 87 (citation omitted) (quoting J.A. 144 n.110). In support thereof, it references a prior FERC matter in which the Commission found "that the use of a zero-rate transmission product that relied on otherwise unused transmission capacity did not constitute a discount." *Id.* (citing *Pub. Serv. Co. of Colo.*, 154 FERC ¶ 61,107 at ¶¶ 84–85 (2016)); *see also* J.A. 143–44. The Commission defines "special" to mean something "favorable to other forms of service." Resp't Br. 90

(citing J.A. 238). Petitioners contend that the Commission's construction contradicts its past regulations, specifically Order No. 888, and otherwise "is at odds with the word[s'] natural meaning." Pet'rs Br. 51.

This Court "afford[s] substantial deference to FERC's interpretation of its own regulations, unless the agency's interpretation is plainly erroneous or inconsistent with the regulation." *City of Oswego v. FERC*, 97 F.3d 1490, 1498 (D.C. Cir. 1996) (cleaned up). We must "defer to the [agency's] interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quotation marks omitted). In addition, "an agency's interpretation of a statute or regulation that conflicts with a prior interpretation is entitled to considerably less deference than a consistently held agency view." *Id.* at 515 (cleaned up).

The plain language of both words at issue does not compel a different interpretation from the construction offered by the Commission. "Discount" is defined as "[a] reduction from the full amount or value of something, esp. a price." DISCOUNT, BLACK'S LAW DICTIONARY (11th ed. 2019). The plain meaning of the word, therefore, implies that there must first be "something" to discount from. Accordingly, the Commission contends that NFEETS is not a discount of "something," because the service is "only available if there is unused transmission capacity," meaning there is no transmission service prior to NFEETS for which the new service is a substitute nor a prior related rate to reduce. Resp't Br. 87.

Of course, this is not the "only . . . reasonable construction" of this term. *Kisor v. Wilkie*, 139 S. Ct. 2400,

2415 (2019). The "something" offered at a reduction here could be the actual cost associated with transmitting energy in these intra-hour trades even though that valuation is missing from the record. As the old adage goes, "nothing in life is free"; everything has a cost. Regardless, the Commission's interpretation of "discounted" does not compel a different construction. The dictionary defines "special" as: "1. Of, relating to, or designating a species, kind, or individual thing[;] 2. (Of a statute, rule, etc.) designed for a particular purpose[;] 3. (Of powers, etc.) unusual; extraordinary." SPECIAL, BLACK'S LAW DICTIONARY (11th ed. 2019). Again, while the Commission's interpretation is not the only available construction, the "regulation's plain language" does not necessarily compel an "alternative reading." *Shalala*, 512 U.S. at 512.

Nevertheless, Petitioners' argument that FERC's construction is inconsistent with Order No. 888 is persuasive. They note that one aspect of NFEETS is that it is "non-pancaked," an example of a "discounted rate" specifically referenced in Order No. 888. *See* Pet'rs Br. 50; *see also* Order No. 888, 61 Fed. Reg. at 21594 ("[T]he pool could make available a transmission rate that is structured the same as the discounted rate (e.g., non-pancaked). . ."). This indicates that "at the time of the regulation's promulgation," FERC intended the term "discounted rate" to include non-pancaked rates like NFEETS. *Shalala*, 512 U.S. at 512.

While FERC did find in *Public Service Company of Colorado* that a zero-rate transmission service was not "a discount of non-firm transmission service," the Commission did not reach that conclusion in the context of determining whether the underlying agreement constituted a "loose power pool" under Orders Nos. 888 and 888-A. 154 FERC ¶ 61,107 at ¶ 84. Rather, the Commission explained in that subsection

why the "proposal for zero-rate transmission service . . . [was] . . . just and reasonable" and not "an impermissible subsidy" for the parties to the underlying agreement. *Id.* The Commission merely stated, without explanation, that the requesting parties in *Public Service* were "not proposing the establishment of a loose power pool." *Id.* ¶ 85. *Public Service* is further distinguished since "the zero-dollar transmission in [that case] only applied within a single [balancing authority area ("BAA")], whereas NFEETS eliminates rate pancaking between [multiple] BAAs." J.A. 140.

Regardless, the Commission's reliance on *Public Service* does not address the specific objection that Order No. 888 gave "non-pancaked" as an example for what the Commission meant by "discounted" "at the time of the regulation's promulgation." *Shalala*, 512 U.S. at 512. The Commission should have provided a more cogent explanation for its interpretation of "discounted" given Order No. 888's explicit reference to non-pancaked as an example of a discounted rate.

The Commission's construction of the word "special" was predicated, at least in part, on its interpretation of "discounted." *See* J.A. 238 ("To the contrary, as used in Order No. 888-A's definition of loose power pool, the word 'special' is reasonably read to connote something favorable, in a manner similar to the word 'discounts' referenced in the same definition."). Accordingly, it was not harmless error for the Commission to have misconstrued the definition of "discounted." Further, had the Commission found NFEETS to be a "discounted" rate, it would have required SEEM to "establish open, non-discriminatory membership provisions and modify any provisions that [were] unduly discriminatory or preferential." Order No. 888, 61 Fed. Reg. at 21594.

Remand is required to afford the Commission the opportunity to provide a sufficient explanation for its determination that SEEM is not a loose power pool or to allow it to change course.

**D.**

Petitioners' remaining challenges to the Tariff Order are easily dispensed.

First, Petitioners contend that the requested tariff revisions violate the "cost causation" principle. Under this Circuit's precedent, rates must "reflect to some degree the costs actually caused by the customer who must pay them" to be considered "just and reasonable." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004). Petitioners highlight Intervenors' "economic analysis" which found that NFEETS, at $0 cost, "could eventually cannibalize some hourly trading yielding a reduction in non-firm transmission revenues." Pet'rs Br. 61 (quoting J.A. 503). They explain that this loss of revenue from hourly traders who switch to NFEETS would lead to transmission providers increasing transmission rates. *Id.* Petitioners argue that this would result in higher costs for non-SEEM customers who will not benefit from lower cost SEEM transactions, such as "independent power producers who sell rather than buy power in the bulk energy market." *Id.* at 61–62.

Section 205, however, does not require "absolute uniformity" between rates or customers' "overall rates of return." *Ala. Elec. Co-op., Inc. v. FERC*, 684 F.2d 20, 28 (D.C. Cir. 1982). As the Commission notes, the short-term hourly trading that may be cannibalized by SEEM brings minimal revenues today to the relevant transmission providers. *See* Resp't Br. 98 (citing J.A. 412). It was not arbitrary or capricious for the Commission to find that a negligible cost

increase to existing customers—the occurrence of which is speculative at best—did not violate the cost causation principle. Our Court "ha[s] never required a ratemaking agency to allocate costs with exacting precision." *Midwest ISO Transmission Owners*, 373 F.3d at 1369.

Second, Petitioners assert that the Commission impermissibly waived the joint tariff requirement. Under the Commission's regulations, a joint system-wide tariff must be filed by transmission providers who enter into any "multi-lateral trading arrangement or agreement that contains transmission rates, terms or conditions," even if the agreement does not constitute a loose power pool. 18 C.F.R. § 35.28(c)(3). Petitioners contend that the Commission arbitrarily granted a waiver to "multiple large Utilities who are control area operators," Pet'rs Br. 55, when prior regulations explain that "it is difficult to imagine any circumstance that would justify waiving the requirements of this Rule for any public utility that is also a control area operator," Order No. 888-A, 62 Fed. Reg. at 12431.

"[I]t is elementary that an agency must adhere to its own rules and regulations." *Reuters Ltd. v. FCC*, 781 F.2d 946, 950 (D.C. Cir. 1986). Accordingly, "*[a]d hoc* departures from those rules, even to achieve laudable aims, cannot be sanctioned." *Id.* While "the agency is not required to author an essay for the disposition of each application [of waiver][,] [i]t suffices, in the usual case, that [the Court] can discern the 'why and wherefore.'" *WAIT Radio v. FCC*, 418 F.2d 1153, 1157 n.9 (D.C. Cir. 1969).

The Commission contends, *inter alia*, that the joint tariff requirement was properly waived since the animating concern for the joint tariff requirement is to address "preferential intra-pool transmission rights and rates," and it did not find that

SEEM is a loose power pool. *See* Resp't Br. 93. We have held, however, that the Commission failed to provide a reasoned explanation for finding that SEEM is not a loose power pool under Order No. 888. Since the Commission has not yet "crystallized" its policy at this stage, this issue is not yet ripe for the Court's review. *Miss. Valley Gas Co. v. FERC*, 68 F.3d 503, 508 (D.C. Cir. 1995). We need not resolve this issue at this time since the Commission must revisit it on remand if it finds that SEEM is not a loose power pool. There is also no significant "hardship to the parties of withholding court consideration" as Petitioners may challenge any future order that results in the waiver of the joint tariff requirement. *Id.*

**IV.**

"'[V]acatur is the normal remedy' when a rule is found unlawful." *Am. Pub. Gas Ass'n v. DOE*, 22 F.4th 1018, 1030 (D.C. Cir. 2022) (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)). Under certain circumstances, however, the Court may remand without vacatur and allow the agency to "fix the deficient rule." *Id.* "The decision to vacate depends on two factors: the likelihood that 'deficiencies' in an order can be redressed on remand, even if the agency reaches the same result, and the 'disruptive consequences' of vacatur." *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

The aforementioned deficiencies can be characterized as "the Commission simply fail[ing] to respond to the objections put before it." *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1053 (D.C. Cir.) *modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002). Since SEEM "began operations in November 2022," Resp't Br. 1, and only provides energy transactions for

non-firm service, it follows that vacatur would not be disruptive, and the parties offer no arguments to the contrary in their briefing. Accordingly, vacatur of the Tariff Order is appropriate. As noted above, the Commission's orders finding Petitioners' rehearing requests of the Deadlock Order untimely are vacated, and the petition—as it relates to review of the Deadlock Order and the associated orders accepting amendments to the SEEM Proposal—is remanded without vacatur of the related orders to the Commission so that Petitioners' timely petition for rehearing may be addressed in the first instance by the agency.

*So Ordered.*

RAO, *Circuit Judge*, concurring in part and dissenting in part: The energy market in the southeastern United States is structured around bilateral transactions that must be individually negotiated. Because of the transaction costs associated with this model, it has generally not been feasible for utilities to conduct short-term transactions. To address this issue, utilities proposed the Southeast Energy Exchange Market ("SEEM"), which includes an algorithm to match buyers and sellers of energy at 15-minute intervals. This proposal went into effect by operation of law, and FERC subsequently approved tariff revisions implementing a new no-cost transmission service (NFEETS) that is central to SEEM.

FERC's order implementing NFEETS was both lawful and reasonable. SEEM adds value to energy markets in the Southeast by permitting beneficial transactions that otherwise could not happen. While SEEM is open only to entities within SEEM's geographic footprint, there are compelling technical reasons why this must be the case. Finally, FERC correctly concluded that SEEM is not a loose power pool. Because I would uphold FERC's approval order, I respectfully dissent from parts III.B and III.C of the majority opinion.

I.

Understanding why FERC's approval of the tariff revisions is reasonable requires some further explanation of how SEEM operates and why it is valuable. As the majority opinion describes, the energy market in the Southeast operates as a traditional wholesale market. In order for utilities to deliver power to customers, they must obtain energy either through their own facilities or by purchasing at wholesale from energy suppliers in bilateral transactions. *See* FERC, ENERGY PRIMER: A HANDBOOK OF ENERGY MARKET BASICS 58, 61 (Apr. 2020). Wholesale agreements incur substantial transaction costs. As SEEM's proponents explained, "[t]o effectuate any particular transaction, the parties must discover one another, negotiate the

terms of the sale, arrange and pay for transmission services across all utilized transmission systems, and schedule the delivery of energy." Accordingly, most transactions occur on a long-term basis, such as through requirements contracts or long-term purchase power agreements. It is rare for trades to occur more frequently than hourly or between entities that are geographically distant. This model leaves a certain amount of energy unused, as transaction costs foreclose parties from entering into mutually beneficial short-term arrangements to buy and sell energy.

SEEM is designed to resolve this problem and is projected to save consumers tens of millions of dollars a year. SEEM applies two design features to make short-term transactions feasible. First, SEEM employs an algorithm to match entities looking to purchase energy with entities looking to sell energy. This algorithm matches eligible buyers and sellers at 15-minute increments, pricing transactions at the midpoint between the offer price and the bid price. The algorithm serves only a matching function. The transactions are consummated under the terms of agreements separately entered into between participants.

Second, transmission owners participating in SEEM must amend their tariffs to make available unused transmission capacity at no cost, in what is called Non-Firm Energy Exchange Transmission Service ("NFEETS"). This removes one major barrier to effectuating short-term transactions, which is arranging and purchasing transmission services for the transaction. The free transmission applies only to unused capacity, and the service can be disrupted by higher-priority transactions. NFEETS thus facilitates a limited set of short-term transactions that are otherwise not feasible under the bilateral model.

SEEM's proponents submitted the proposed agreement to FERC under section 205 of the Federal Power Act. 16 U.S.C. § 824d(a). As the majority opinion describes, FERC deadlocked as to the SEEM proposal and SEEM took effect by operation of law in October 2021.[*] Shortly thereafter, FERC approved by majority vote proposed tariff revisions implementing NFEETS. *See Duke Energy Progress, LLC*, Order Accepting Tariff Revisions ("Tariff Order"), 177 FERC ¶ 61,080 (Nov. 8, 2021). FERC later denied rehearing, amending the Tariff Order to respond to certain concerns raised by petitioners. *See Duke Energy Progress, LLC*, Order Addressing Arguments Raised on Rehearing ("Tariff Rehearing Order"), 178 FERC ¶ 61,195 (Mar. 24, 2022).

II.

Petitioners argue it was arbitrary and capricious for FERC to approve NFEETS. Primarily, petitioners argue the organizational structure of SEEM will permit the vertically integrated utilities that run the market to discriminate against competing generators. The majority correctly rejects this argument, as FERC reasonably found that SEEM's members would benefit from a large number of potential counterparties, thus discouraging members from discriminating against competitors. *See* Maj. Op. 24–26. The majority also correctly rejects petitioners' argument that NFEETS violates the cost-causation principle. *See* Maj. Op. 34–35. Nonetheless, the

---

[*] I agree with the majority that FERC erred in finding the requests for rehearing of the Commission's deadlock order untimely. I also agree that petitioners have standing to challenge the orders at issue here.

majority vacates the Tariff Order, finding the approval of no-cost transmission service (NFEETS) arbitrary and capricious.

The reasons offered by the majority lack support in the record, and I would hold that FERC acted lawfully and reasonably when approving NFEETS in the Tariff Order.

A.

First, the majority faults FERC for failing to explain why SEEM could permissibly exclude bilateral trading partners located outside the Southeast. *See* Maj. Op. 26–29. Because NFEETS is only available to participants in SEEM, the majority suggests the Commission's approval was arbitrary and capricious. But FERC explained, in detail, why it was technologically infeasible for the new market to include those utilities and why SEEM was nonetheless an improvement over the status quo.

In its landmark Order No. 888, FERC required utilities to provide open access "to any entity that can request transmission services." *See* Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, 61 Fed. Reg. 21,540, 21,570 (May 10, 1996). To implement this rule, FERC promulgated *pro forma* tariffs guaranteeing open and non-discriminatory access to transmission lines. Utilities may propose deviations from the *pro forma* tariff so long as "such terms and conditions are consistent with, or superior to" the terms and conditions in the *pro forma* tariff. *Id.* at 21,619.

FERC reasonably found that NFEETS, the no-cost transmission service designed to implement SEEM, comported

with these standards. NFEETS does not limit access to any currently existing service. Rather, it provides an entirely new service that facilitates valuable short-term energy transactions, resulting in substantial cost savings across the Southeast. *See* Tariff Order at P 40. The tariff revisions are thus strictly preferable to the existing tariffs. And while there are limitations on which entities can participate in SEEM, these constraints "incorporate preexisting requirements in the Southeast bilateral market, are widely [] used, and are also necessary from an operational perspective." Tariff Rehearing Order at P 23.

The majority does not contest FERC's conclusion that the availability of NFEETS will add value by making SEEM possible or that this no-cost transmission service operates in a non-discriminatory way. Nevertheless, the majority finds FERC's explanation wanting because existing trading partners located outside the Southeast will not be able to access SEEM or NFEETS and because "there is no explanation in the record" why SEEM could not have been designed to allow such entities to participate. Maj. Op. 28.

But the record belies the majority's conclusion. The Commission explained at length why SEEM's geographic requirement was necessary. As the Southeast energy market is structured today, transmission service cannot be assigned without an e-Tag, which in turn requires utilities to possess either a "registered Source" or a "registered Sink." *See* Tariff Order at P 66. This technical requirement predates SEEM and renders it "not currently technically feasible" for transactions to occur on a short-term basis with entities not located within SEEM's geographic footprint. *Id.* As the utilities explained, the e-Tag system makes it impossible to reliably coordinate the timing of transactions conducted outside of that footprint. SEEM did not invent the e-Tag system; it simply incorporated

e-Tag as part of the existing infrastructure for energy transactions in the Southeast. It would be absurd to suggest (and the majority doesn't) that SEEM's proponents were required to redesign the existing energy infrastructure before seeking approval of NFEETS.

Moreover, the majority nowhere finds that FERC's considered, technical judgment on this matter is incorrect. Rather, the majority merely muses that SEEM's proponents could have abandoned their proposed market design and instead opted to "provide intra-hour trades at a longer interval." Maj. Op. 29. But the majority's hypothetical would undermine the primary benefit of SEEM, which is to permit short-term transactions that currently do not occur because of transaction costs. SEEM was designed to permit trades to occur on relatively short intervals. The shorter the transaction time the greater the number of mutually beneficial transactions that may occur, and hence the greater the value added by SEEM. Alternatively, the majority speculates there might be some "workable alternative besides e-Tags that would not exclude existing partners yet allow for intra-hour trades." Maj. Op. 29. But the majority does not suggest what such an alternative would be; the petitioners do not advance any such alternative in their briefing before us; and no such alternative appears in the record. FERC was required to consider the proposal before it, not whether NFEETS was superior to any alternative that may be conceived by a panel of this court.

The majority effectively requires a heightened standard for new services that may exclude *existing* market participants. Maj. Op. 29. But this fails to recognize that SEEM creates a *new* market for short-term energy sales. This new market does not supplant the existing bilateral wholesale market for long-term sales, a market that remains available to trading partners

outside of SEEM. Instead, SEEM establishes a mechanism for short-term sales and provides no-cost transmission to effectuate those sales. Some providers with wholesale contracts cannot participate in this arrangement because of their location. But that does not answer the question before the Commission, namely whether the no-cost transmission service for SEEM was "consistent with, or superior to" the existing *pro forma* tariff. The Commission reasonably approved NFEETS by concluding SEEM was a valuable new service, facilitating socially beneficial energy transactions that could not otherwise occur, and that NFEETS was necessary to effectuate SEEM.

This was sufficient for FERC to approve NFEETS. The fact that FERC failed to consider hypothetical energy market structures postulated by this court does not render the Tariff Order arbitrary and capricious. In light of the record before it, the Commission made a reasoned decision in approving the rate filing.

B.

Second, the majority suggests that SEEM might have constituted a loose power pool and that the Commission failed to explain its finding to the contrary. *See* Maj. Op. 29–34. If SEEM were a loose power pool, transmission owners would be required under Order No. 888 to provide transmission service through a joint pool-wide tariff, rather than through the individual tariff revisions necessary to effectuate NFEETS. *See* 61 Fed. Reg. at 21,594. But as the majority notes, SEEM was not a loose power pool under the operative regulatory definition. Under that definition, a loose power pool is "any multilateral arrangement, other than a tight power pool or a holding company arrangement, that explicitly or implicitly contains discounted and/or special transmission arrangements,

that is, rates, terms, or conditions." Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, 62 Fed. Reg. 12,274, 12,313 (Mar. 14, 1997).

While SEEM is a "multilateral arrangement," FERC reasonably concluded it does not include "discounted and/or special transmission arrangements." The majority apparently agrees on this point, explaining that the plain meaning of "discounted" and "special" presumes a comparable service that is *not* discounted or special. *See* Maj. Op. 30–32; *see also* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003) *discount* ("[A] reduction made from the gross amount or value of something."); *special* ("[D]istinguished by some unusual quality; *esp*: being in some way superior."). As FERC explained, SEEM allocates otherwise unused transmission capacity "and thus entails no opportunity costs." Tariff Order at P 64. In other words, since SEEM creates the opportunity for new transactions, it does not in any sense result in a discounted or special rate from existing arrangements.

Despite the majority's agreement on this straightforward interpretation, it finds FERC's construction "inconsistent with Order No. 888." Maj. Op. 32. To support this conclusion, the majority rests on a passing parenthetical in Order No. 888, which suggests as an example of discounted rates those that are "non-pancaked." 61 Fed. Reg. at 21,594. A "pancaked" rate arises when energy is sold from one grid into another, causing transmission fees to stack up. Since NFEETS provides transmission service at no cost, the majority reasons that it is non-pancaked and therefore discounted.

NFEETS, however, eliminates all transmission charges, so there is no question of pancaking (or not pancaking) a series of charges—in effect there is no cake at all. Of course, as Order No. 888 recognizes, in some circumstances eliminating one or more of the rates in a pancake of stacked rates will result in a discount. FERC stated that NFEETS "eliminates rate pancaking," Tariff Order at P 54, but that is because it eliminates all rates, not because it is a non-pancaked discount. Focusing on flapjacks does not undermine the core of FERC's analysis, which the majority endorses, namely that there is no comparable service and that the word "discounted" can do no work absent such a baseline.

At least the majority declines to adopt the strained definition the opinion hints at—that a service without opportunity costs is never special or discounted, except in the specific circumstance when it is non-pancaked. The majority simply concludes FERC must "provide[] a more cogent explanation" on remand. Maj. Op. 33. But this is a pointless exercise. The proper interpretation of FERC's regulations is a legal question that may be resolved by this court in the first instance. As the majority agrees, the phrase "discounted or special" does not encompass the services provided by SEEM. On remand, FERC will thus be compelled to reiterate its conclusion that SEEM is not a loose power pool. Accordingly, any deficiency in FERC's explanation is harmless. Remand is "unwarranted in cases where there is not the slightest uncertainty as to the outcome of the agency's proceedings on remand." *Calcutt v. FDIC*, 143 S. Ct. 1317, 1321 (2023) (per curiam) (cleaned up).

\* \* \*

SEEM provides a valuable service by establishing a new market for utilities in the Southeast to engage in short-term energy transactions. Because FERC reasonably approved the no-cost transmission service necessary to implement SEEM, I respectfully dissent from the majority's decision to vacate the Commission's order. In light of the record before us, the Commission acted lawfully, and I would deny the petition for review of the Tariff Order.